Kent, J.
It was understood to be the agreement of the parties, in consequence of the special clause in the policy, and it was so admitted at-the argument of the cause, that the question whether the warranty was broken *or [*365] not, was open for. examination, notwithstanding the sentence of condemnation in the vice-admiralty court.
If this condemnation be warranted by the law of nations, it was, then necessary to have disclosed to" the insurer the part ownership of Hawley, as that circumstance materially increased the risk. There was also a breach of the warranty ; for the averment that the property was American, must be. wholly and strictly true; since the sound construction is, that the policy must be American, in respect to the powers at war, and not merely in respect to our municipal law. The contract had reference to an intercourse with foreign nations ; and the security which was the object of the warranty, was such as would be granted by the law of nations under the sanction of which all foreign intercourse is to be conducted.
If, on the other hand, the sentence Of condemnation was not conformable to the law of nations, then the warranty has not been broken, nor was it necessary to disclose the ownership of Hawley, as it could not be material. (Park, 195, Mayne v. Walter.)
The decision of this cause, therefore, turns wholly on the legality of the sentence of condemnation at New" Providence, as far as it respects Hawley: And the question is, was the property of Hawley, who at, the commencement of the risk, resided at the Havana, in the quality of consul, and trans *436 acted business as a merchant, American property, within the purview of the law of nations ?
On this point I have no doubt.' The reasons assigned in the decree "of condemnation, appear sound. • The judge observes, “ that consuls have certain privileges and immunities, but that if they enter into trade, they are tied down by the same restrictions as other merchants are; that if consuls had a right, in their consular capacity, to enter into trade, and to be freed from being considered as residents in the belligerent country, they Would have it in their power to cover foreign property, under the mask of its being American, to an mímense extent.’? This would,-undoubtedly, be [*366] the case. The-law which authorizes ^maritime capture would be altogether evaded,. and become, perhaps, null, if neutrals were permitted to reside within the belligerent territories, and to carry on trade under neutral protection. However- favorable such - an effect-'might be to the- policy of neutrals, yet it is sufficient to observe, that a state of war is permitted by the law of nations; that it has its relations and its rights as well as a state of peace, and thát neutrals are. bound to conduct themselves in conformity to those relations and those rights.'
In order to- guard against abuse, and to ascertain the parties at war by some determinate criterion, it seems now to be pretty generally understood, that the domicil shall be the test by which to determine Whether a person is to be regarded ’ as a subject Or a foreigner. It was a maxim of the [*367] civil law, that incolas domicilium facit,(a) and *the *437 domicil was defined by the same law, to be the place where a person resides and carries on his business.
It was in the spirit of this general rule, that the ordinance of France, in 1704, and that of 1744 were dictated, which declare, that neutrals, fixing their domicil, and carrying on commerce in a belligerent territory, were to be treated as enemies. 2 Valin, 249, art. 8. 258, art. 11.
*438 As long as public ministers and consuls confine themselves to the business appertaining to their public characters, their domicil is not changed, but remains in the country from which they are deputed, and they are not subjects of the country in which they reside. Yattel, 231. Martens, 155, 229.) But if they engage in business inconsistent [*368] with, or foreign to their public or diplomatic character, they are thenceforth to be considered as domiciliating themselves abroad, and becoming as subjects, amenable to the ordinary jurisdiction of the state. (Yattel, 711, 714.) As they contribute, by their industry and property, when; engaged in trade, to aid the government under which they reside, it is but reasonable, that the enemies of that government should have a right to hold their property responsible, as that of an enemy.
I am of opinion, therefore, that Mr. Hawley, by becoming a merchant at the Havana, a character wholly distinct from his consular functions, was rightfully considered as establishing his domicil there ; and that he became, in regard to his transactions as a merchant, and in reference to the enemies of Spain a Spanish subject.(a) The condemnation, there *439 fore, of the property of Hawley was lawful; and the warranty was not strictly or wholly true, nor was a material fact disclosed to the insurer. On either ground, there must be judgment for the defendants.
R.ADCLIFF, J. and Benson, J. were of the same opinion.
Lansing, Oh. J. In the policy is contained a, warranty, that the goods were American property, and that proof of their being so should be made at New YorK.
Hence it becomes necessary to examine,
1. ' The intent of the warranty ; and,
2. Whether it has been verified.
The doctrine of insurances imposes it on the contracting *440 parties, to acquire the'kno wledge of existing wars,' and the influence those may have on maritime adventures. They ' are to be presumed to know the extent of those wars, what nations are belligerent, and those who remain neutral. The parties in this case must of course have known, that American, as neutral property, ought to be respected by. the nations at war, and that a less' degree of risk was attached to * property of that description, than to that of citizens ot subjects of those powers.
[*369] In this situation-, it could not have been their intent, in forming the warranty in question, to apply the term American property, merely as descriptive of the legal import of those terms, tested by the laws of the. United States. It obviously applied to the general maritime law which regulated objects of this kind.
The language of the warranty séems to be this: I. warrant this to be American property, and that it is of a description which all thé powers at war ought, to respect as such. But as in some instances, arbitrary distinctions, originating in national views or local ordinances, have prevailed in the foreign courts, to some of which the construction of what constitutes property of this description, may be submitted, I reserve to myself the right of having it decided by the tribunals of our own country—but on the ground of the general maritime law, established by the usages of nations.”
If this exposition is correct, the next question may be solved, by examining whether the goods insured were of a description entitling- them to be considered as American property.
The sentence of condemnation declares the goods-to be the property of persons resident in the dominions of Spain, one of the powers at war, and as such, good prize to the captors. The warranty. has, however, excluded that sentence from operating to the prejudice of the insured, it containing an express stipulation, that the proof of this being American should be made exclusively at New York. . So that, the question, is not merely, has this point been decided by the court of vice-. *441 admiralty at New Providence, but were the circumstances of this case such, as to warrant the decision ?
It.appears, from the case, and it is expressly admitted, that Hawley, one of the persons interested with the plaintiffs, had his domicil at the Havana, in the island of Cuba, in the dominions of the king of Spain, one of the powers at war, and that he was a citizen of the United States, and their consul at that place.
*Among the effects of the residence of foreigners, [370] in a state of which they are not citizens, Yattel (Yattel, 155, § 105, 100; Ib. 15S,§ 114,) enumerates the duty of contributing to its defence, and to all taxes, (those excepted which have only a relation to the citizens) and they certainly aid the revenue of the country in which they reside, by their consumption of articles on which excises or duties are imposed.
The doctrine attempted to be established from Yalin, (2 Yalin, 249, art. 8, 251, art. 11,) appears to derive little support from the temporary regulations we find referred to in the argument, as it appears that the ordinances in which that doctrine is contained, were not permanent in affirmance of the law of nations, and of consequence, merely devised as means to carry the principles of that law into effect, but limited in their duration to the existing war in which France was then engaged. They were calculated, among other objects, to deprive the subjects of the powers at war, who had not been naturalized, and had not transferred their domicil into the dominions of the neutral powers, before the commencement of the war in which France was then engaged, and those who, though naturalized, had since returned into the enemy’s country to pursue their commerce, of the rights they claimed as neutrals; They are to be received as dictated merely by the policy of the king and country in which they originated; and in the instances in which they conform to the general law of nations, they only tend to show that the principles of that law influenced the French government in the formation of those ordinances.
One of those temporary ordinances was passed in 1704, the other in 1744. They are nearly of the same import *442 though the expression is somewhat varied. They appear to have been intended ro regulate the proceedings of the prize courts, and to promulgate the principles by which their, decisions should be regulated.
Vattel (Vattel, 92, § 213,) observes, that the inhabitants of a country as distinguished from citizens, are strangers who are permitted to settle, and stay in the country. Bound by their residence to the society, they are subject to [371] the laws of *the state while they reside there, and they are obliged to defend it, because it grants - them protection.
If, then, persons who have their domicil in a foreign country, are subject to contribute to the exigencies of the state, by paying a portion of the public taxes, and obliged to defend it, they can have no pretensions to be considered as neutrals. They form a part of the efficient force of the country in which they reside, that force which is exerted to repel or annoy its ' enemies; and it would seem strange, that in a situation so intimately connected with that country, as to render it difficult to distinguish them from its subjects, the protection of neutrals should be extended to them.
It appears to me, from these considerations, that the adjudications of the British and French courts, which have been made on this ground, during the existing war, were well warranted by the law of nations.
But it has been urged, that as Hawley was a consul of the United States, he is, as such, in some' measure, entitled to the protection of the laws of nations.
The admission of consuls depends either upon express convention, or the permission of the sovereign in whose dominions they reside, (Vattel, 132.) But by receiving them, the sovereign strictly engages to allow them all the liberty and safety necessary in the proper discharge of their functions. W'hat personal immunities a consul is particularly entitled to, it is not necessary, on the present occasion, to consider; for whatever they may be, they can only be such as to. preserve his safety and independence in the discharge of those functions. An exemption from imposts is not essential to his *443 quality of consul; if he engaged in mercantile speculations, he is of course subject to all the burdens which other inhabitants, .not subjects of the country in which he resides, are liable to. If there is any difference between his situation and that of other strangers, it may, perhaps, arise from his being, as an acknowledged public functionary of a foreign nation, exempted from personal service in any hostile enterprise. This, however, *will not so effectually disen- [*372] gage him from the interests of the society in which he resides, as to make him completely a neutral. His property must contribute to the support of the war.
If he is to be considered, as a subject of Spain, in consequence of his having his domicil in its dominions, the warranty was not complied with in this case, and of con sequence, a strict compliance with a warranty being required, the policy is void.
On these grounds, I am of opinion, that the plaintiffs ought not to recover in this cause, and that judgment should be rendered for the defendants.
Lewis, J. dissented..
Judgment for the defendants.(a)

 By the civil law, a bare habitation, or temporary residence in a place, didnof.create the jits incolatus., “ :E.t in eodem loco singfilos habere -.donticilium non ambigitur, ubi quis larem rerumque ad fortunarum suarum summam fionstituit,,unde rursus non sit discessvrus, si nihil advocet: unde cmnprofecías est, peregrinari mdetvr ; quod si redit, peregrinan jam destitit.” Cod. jib. 10, tit. 39, 1, 7. So in the Digest, lib. 50, tit. 16,1,203. Earn domum ■unicuique nostrum debere existiman, ubi quisque sedes et tabulas haberet, sua. rumque rerum constituti onem fecissit. Agreeably to this, is the opinion of Lord Loughborough, in the case of Bempde v. Johnstone, (3 Vez. jun. 201.) See also the case of Somerville v. Somerville, (5 Vez. jun. 750,) where the question of domicil was learnedly and elaborately discussed.
*437 In the case of The Vigilantia, (1 Rob. Adm. Rep. 13, 14,) Sir William Scott says, that where there is nothing particular or special in the conduct of a vessel itself, the national character is determined by the residence of the owner; but there may be circumstances arising from that conduct, which will lead to a contrary conclusion. He refers to the decision of the lords o f appeal in 1785 ; that where one of two partners resided in Denmark, and the other in St. Eustatius, where they established a house of trade, that the share of the partner resident in St. Eustatius, was liable to condemnation, as t he property of a domiciled Dutchman. So in 1795, in the case of one of two partners emigrating from Nantucket to France, for the purpose of carrying on their fishery, the property of the partner domiciled in France, was condemned.
Again, in 1798, it was decided, that if a person entered into a house of trade in the enemy’s country, in time of war, or continued that connection during the war, he should not protect himself by mere residence in a neutral country. '
In the case of The Endraught, (1 Rob. 19,) Sir William Scott said, that if a neutral chose to engage himself in the trade of a belligerent nation, he must be content to bear all the consequences of such a speculation ; and if he confines his vessel exclusively to the enemy’s navigation, he is liable to be considered as an enemy, with respect to the concerns of such vessel. (See also 1 Rob. 105, 24. 2 Rob. 322, et seq.)
In the case of Mr. Johnson, (3 Rob. 12,) and of Mr. Millar, (3 Rob. 27, the Indian Chief,) it was decided, that the character of an American consul residing in a foreign country, would not protect that of the merchant, when united in the same person; and Sir William Scott cites several cases before the lords of appeal, in 1782, 1784, and 1797, where it was so settled, after solemn argument. (See also 3 Rob. 38, 39, 41, 44. 4 Rob. 26, 232, 239. Rob. 379.)
In Tabbs v. Bendlelack, (4 Esp. Cas. N. P. 108,) Lord Kenyon considered an American residing with his family in England, and carrying on trade from that country, so far a British subject, in regard to belligerents, that if he warranted his ship to be American, the warranty failed, and he could not recover in case of a capture.
On the question of domicil, see further, Marsh v. Hutchinson, (2 Bos. & Pull. 226,) and the case of Bruce v. Bruce, in a note, p. 229, and the cases there cited.

 In Livingston v. Maryland Ins. Co. 7 Crunch, 506, 542, Mr. Justice Story, said ; “ It is clearly the law of nations that the national character of a person "for commercial purposes, depends upon his domicil. But' this must be- carefully distinguished from the national character of his trade. For the party may be a belligerent subject, and yet engaged in neutral trade ; or' he may be a neutral'subject and yet engaged in hostile trade. Some of the cases respecting the colonial and coasting trade of enemies, have turned upon this distinction. But whenever a person is bona fide domiciled in a particular country, the character of the country irresistibly attaches to him. The rule has been applied with equal impartially in favor, and against neutrals and belligerents. It is perfectly immaterial what is the trade in which the party is engaged, or whether he be engaged in any. If he be settled bona fide', in a country with the intention of indefinite residence, he is to all foreign countries, to be deemed a subject of that country.” This case was an action on a policy of insurance, containing a warranty that the property was neutral. The warranty was determined to be satisfied by the emigration of the party, a Spanish subject to the United States, and residing here before the breaking out of the war in 1804, between Great Britain and Spain, the property having been captured by a British cruiser, and condemned in the prize court at Halifax, as Spanish property. A majority of the court were of opinion that *439 the insured was to be considered as a merchant of the United States, whether he carried on trade generally or confined himself to a trade from the United States to the Spanish provinces. See also, The Venus, 8 Craneh, 278. The Friendschaft, 4 Wheat. R. 105. In Elbers & Kraffts v. The United States Ins. Co. 16 Johns. R. 128, the plaintiffs were Swedish subjects, and partners in trade at St. Bartholomews. In 1811, Kraffts came to the United States, and in July, 1813, Kraffts, still continuing in the United States, a policy of insurance was underwritten on account of Elbers & Kraffts, on cargo for a voyage from New Haven to St. Bartholomews, warranted Swedish property. Held, that from the long previous residence of Kraffts in this country, it was to be presumed that he intended to reside here permanently ; that it was incumbent on the insured to repel the presumption, which was not done in this case; that whether Kraffts had a permanent counting-house here or not, was immaterial to the question; and therefore, as Kraffts was to be regarded as domiciled in the United States, that the warranty was not complied with, and the insured could not recover for a loss. It was further held, that the property of a citizen or subject of a neutral domiciled in a belligerent country, is liable to capture and condemnation as prize of war by the other belligerent; and a warranty in a policy of insurance on such property, that it was neutral property is not complied with. Consult also upon this subject; 1 Wheat. R. 55, n. (/) ; also 2 Wheat. R. Appendix 27, etseq.; and the following authorities-in support of the general principle. The Vigilaniia, 1 Rob. 1. The Endraught, id. 19. The Surah Chriétina, id. 237. The Adriana, id. 313. The Indian Chief, 3 id. 23. The President, 5 id. 277. . The Neptunus, 6 id. 403. The Francis Gillespie’s Claim, 1 Galiis. 614, 618 ; 7 Craneh, 542. M’Connel v. Hector, 3 Bro. & Pul. 113; Bynk. Q. J. Pub. Ch. 3, Duponceau’s edition, p. 19, 25. The Josephine, & Rob. 25. The Harmony, 2 id. 322. The Embden, 1 id. 17. The Dree Gebroeders, 4 id 232. The Diana, 5 id. 60. The Ocean, id. 91. The Boedes Lust, id. 233, 248, Jonge Classina, id. 297. Wheaton on Captures, 141, 157. The Ann Green, 1 Galiis. 274. The Joseph, id. 545. The Francis, 8 Craneh, 335, 363. The Rugen, 1 Wheat. R. 65.

 This judgment was affirmed in the court of errors, in 1801.