(PRIZE.)

## *The Mary and Susan.*—RICHARDSON, *Claimant.*

Goods, the property of merchants actually domiciled in the enemy's
country at the breaking out of a war, are subject to capture and con-
fiscation as prize.

The fact, that the commander of a private armed vessel was an alien
enemy at the time of the capture made by him, does not invalidate
such capture.

The President's instructions of the 28th August, 1812, prohibiting the
interruption of vessels coming from Great Britain, in consequence
of the supposed repeal of the British Orders in Council, must have
been actually known to the commanders of vessels of war, at or
before the seizure, in order to invalidate captures made contrary to
the letter and spirit of the instructions.

APPEAL from the Circuit Court for the district of
New-York. This was a claim by Mr. Richardson
for a portion of the cargo of the same ship mention-
ed in the preceding cause, which portion was con-
demned in the district and circuit courts. The
claimant, a native of Great Britain, and a naturalized
citizen of the United States, was a resident merchant
of Liverpool at the breaking out of the late war, but
returned to this country in the month of May, 1813,
after knowledge of the capture, and pending the
proceedings in the district court. The capture was
made on the 3d of September, 1812, within 18 miles
of Sandy Hook, in 13 fathoms of water, where ves-
sels are frequently passing and anchoring, and the
privateer had previously spoken at sea another pri-
vateer and a pilot boat schooner from Philadelphia.

There was also contradictory testimony as to whether the commander of the privateer had knowledge of the president's additional instructions of the 26th of August, 1812, before the capture, which, as it is noticed in the opinion of the court, it is unnecessary to state. By those instructions the public and private armed vessels of the United States were not to interrupt any vessels belonging to citizens of the United States, coming from British ports to the United States, laden with British merchandise, in consequence of the alleged repeal of the British Orders in Council, but were, on the contrary, to give aid and assistance to the same, in order that such vessels and their cargoes might be dealt with on their arrival as might be decided by the competent authorities.

*Stockton*, for the appellant and claimant, stated, that this was a case of *summum jus*, where the property of a citizen, shipped without knowledge of the war, upon the repeal of the British Orders in Council, was condemned upon the authority of the Venus,[a] and the doctrine of domicil. There is here no question of proprietary interest, or of national character, independent of this particular transaction. But, unless the court thinks proper to review its decisions upon the effect of commercial domicil, the appellant is confined to three points in support of his claim:

1st. That the capture was made after the commander of the privateer had knowledge of the instructions of the 26th of August, 1812.

a February Term, 1814.

*Margin note:* 1816. The Mary and Susan.

1816.

The Mary
and Susan.

2d. That if he had not such knowledge, condemnation cannot take place, as the capture was made subsequent to the issuing of the instructions.

3d. That the commander of the privateer is, and was at the time of the capture, an alien enemy, and consequently, his commission is void.

1. This is a question of fact, to be determined by the weight of testimony. 2. The instructions were certainly communicated to the commander before prize proceedings were commenced, and it was the duty of the captors to have relinquished the property, subject to the decision of government, under the Non-Importation Act. Capture does not vest the property of the goods in the captors, but merely authorizes them to carry in for adjudication. The Prize Act of the 26th of June, 1812, sect. 6., shows that the property is not vested in them until after condemnation. All laws take effect from their enactment, as to rights of property; and at common law, statutes take effect, by a fiction, from the first day of the session at which they are passed. The instructions, issued under the 8th section of the Prize Act, are legislative in their nature. Captors are the mere delegates and substitutes of the sovereign; their authority is derived from him, and must be exercised in conformity with the will of the state.[b] The power of the president to issue these instructions, has already been recognized by the court. The rights of war and peace depend upon the *fact* of the existence of a state of war and peace

b 2 *Azuni,* part 2. c. 5. art. 3. sect. 4, 5. 7. 10.

not upon the *knowledge* of that fact. A prize made
after a declaration of war, without knowledge of its
existence, is good; and a prize made after the cessa-
tion of hostilities is bad, without regard to the cir-
cumstance of knowledge; unless, indeed, there be
a stipulation in the treaty of peace to prolong hos-
tilities at sea. 3. The commission to Johnson, the
commander of the privateer, is null. The President
has been deceived in his grant; for he could never
have intended to commissionate a person to commit
treason against his own country. The acts of con-
gress, during the late war, put alien enemies under
restraints which are altogether opposed to the idea
of the executive being authorized to delegate to
them such a power as letters of marque and reprisal
import.

*Hoffman*, for the respondents and captors. It is
supposed that the question, as to the application of
the law of domicil to this case, is at rest.

[MARSHALL, Ch. J. The court considers that ques-
tion completely settled, and not open for argument.]

*Hoffman.* 1. As to the instructions. It is admit-
ted that the former decisions of the court make them
obligatory. The instructions could, in fact, have
been communicated to the commander of the priva-
teer previous to the capture; and they are not, *ipso
facto*, and *per se*, revocatory of the right to capture.

c 2 *Azuni*, part 2. c. 4. art. 1. sect. 9. [11]

The instructions must either have been actually
communicated, or the privateer must have been in
port after they were promulgated, in order to affect
the right to capture. Such is the spirit of the for-
mer decisions.[d] Cruisers are not to act upon informal
information at sea, as they might be deceived by
their rivals and competitors; in port, knowledge
must be implied, in law, from the certainty, publici-
ty, and notoriety of the fact. The right of property
does vest, by capture, to be subsequently consum-
mated by condemnation; *quoad*, the belligerants the
right vests; the property of the enemy is devested
as to his rights. The claimant is an enemy, *pro hac
vice.* 2. The affidavits to prove the commander of
the privateer an alien enemy, were irregularly taken.
The cause was open, as it were, to plea and proof;
but the farther proof was confined to the communi-
cation of the instructions; and the simplicity of the
prize proceedings forbids going out of the limits pre-
scribed in the order for farther proof.

*Pinkney*, on the same side. The court will not
regard the particular hardship of the case, but will
only be anxious to administer the law of nations and
of the land, as they are applicable to the rights of
the parties. 1. Knowledge of the instructions was
communicated to the captor, before the *deductio in-
fra præsidia;* before the prize proceedings were com-
menced; before condemnation; but *after* the seizure,
which vested an inchoate right in the captor. It is
said, the written law prohibited him from making it;

d *Wheaton on Captures,* 48.

but *that* is settled, and the court have said, the instructions were not to be likened to statutes. They are merely directory from a superior to a person in a subordinate capacity; and they must be received by him, or they cannot have the binding force of instructions; they were not law until communicated: then only they rise into law. It is also said, that the capture was well made, but subsequent knowledge shall overreach and vitiate it. In every case of capture of goods, in their transit to this country, after the repeal of the British orders in council, the same fact must have been known before condemnation. The instructions inhibited the *capture and interruption* of American vessels coming from British ports; but the President could have no authority to devest rights once vested; and there is nothing in the instructions to prohibit bringing in for adjudication after the capture was made, nor to prohibit prize proceedings after bringing in for adjudication. By the 4th section of the Prize Act, it is provided, "That all *captures and prizes* of vessels and property, shall be forfeited, and *shall accrue* to the owners, officers, and crews, of the vessels by whom such captures and prizes shall be made; and, *on due condemnation had, shall be distributed,*" &c.; by which an inchoate right vested on the capture, to be consummated by condemnation. The prize law of France and Spain vests the property immediately; other countries require bringing *infra præsidium* and condemnation. Capture gives, everywhere, a right to privateers, though it may not give an indefeasible right to public ships. A qualified and provisional

property is vested; and it is held, both in France and England, that the crown cannot interfere to stop prize proceedings where private parties have an interest. Admit that no right of *property* is acquired, is *no* right acquired? Most certainly an incipient right is acquired, to be afterwards consummated; and the instructions cannot have the effect, *retroactively*, to defeat the right of the captors to proceed to adjudication. The case of a treaty of peace, stated on the other side, illustrates this idea. *Belief* is nothing; *fact* is every thing. The captor exercises a belligerant right; the treaty repeals his commission and abrogates his right. Suppose a capture made the day before the treaty is signed, does it prevent his going on and perfecting his right? Certainly not; and the same is the case with the instructions: if they do not stand in the way of the capture, they do not stand in the way of condemnation. They did not stand in the way of capture, because they were unknown; they do not stand in the way of condemnation, because that is a mere consummation of the incipient right acquired by capture. 2. The court have no right to look beyond the President's commission; the captor stands everywhere upon it, especially in the prize courts of the power by whom it is issued; and there is no case where the contrary was ever maintained.

*Dexter*, for the appellant and claimant. 1. It is said the claimant must either prove that the privateer had been in port, *or* that the instructions were

actually communicated to the commander. If it were intended to make him a wrong doer, strict proof of knowledge might be essential; without such proof, he would be excusable from paying costs and damages; but he does not thereby acquire any indefeasible right to the thing captured; and restitution must be ordered. The claimant seeks restitution only, and the first question is, whether the captor had knowledge of the issuing of the instructions, no matter how it came to him. 2. But supposing that he had not this knowledge *before* the seizure; it was communicated to the prize master while he was carrying in the ship for adjudication. He was bound by the instructions, " not to interrupt, but, on the contrary, to give aid and assistance" to the ship he captured. Does the right to proceed contrary to the instructions vest at the time of boarding, or manning? It undoubtedly vested when the ship was completely brought *infra præsidia*. But the acts done in the intermediate time between *that*, and the taking possession, constituted an *interruption* contrary to the letter and spirit of the instructions. The right acquired by the seizure was inchoate, and was sought to be consummated after the rule of conduct prescribed by the President became known to the captor. The rule as to capture vesting the property is various and fluctuating in different times and nations. The distinction here is, that an *inchoate* right may be defeated by a knowledge of the instructions subsequently communicated: but a *consummated* right cannot. The President has authority, both by our municipal constitution and public law, to prose-

1816.

The Mary
and Susan.

cute a war lawfully declared; he may exempt this or that thing from attack or capture, by land or by sea. Suppose an enterprise commenced before knowledge of an order from him countermanding it, could the blockade, or siege, or expedition, be continued after such revocation became known? The captor has acquired, in the present case, no private right which the instructions cannot defeat. Government may, by compact with foreign nations, devest inchoate rights; in a treaty of peace, restitution of captures on both sides may be stipulated.[e] 3. The order for farther proof justifies the admission of testimony as to the alien enemy character of the commander. The president's commission is, doubtless, conclusive, wherever he acts within the authority confided to him by the laws; but he cannot commission an alien enemy, whose sovereign would have a right to punish him as a traitor; and even a naturalized citizen has no right to cruise against his native country.

Feb. 13th.

JOHNSON, J., delivered the opinion of the court.

It is not necessary to go into a consideration of the national character or future designs of the claimant in this case. It has been solemnly settled, and must henceforth be considered as the positive law of this court, that shipments made by merchants, actually domiciled in the enemy's country at the breaking out of a war, partake of the nature of

[e] Vide Convention of 1800, between the United States and the French Republic; by the 30th article of which, restitution of public ships captured on both sides was stipulated.

enemy trade, and, as such, are subject to belligerant capture. Whatever doubts may have once been entertained on this bench, with regard to the necessity or propriety of adopting the principle into the jurisprudence of this country, they are now either dissipated or discarded; and the character, views, and even the subsequent acts of such a shipper, cannot vary the conclusion of law upon his claim.*f*

1816.

The Mary and Susan.

*f* The effect of domicil, or commercial inhabitancy, upon national character was recognised by the Continental Court of Appeals in Prize Causes during the war of the revolution. (2 *Dallas,* 42. Claim of Mr. Vanteleriger.) It was determined by the supreme court, during the hostilities with France, that a citizen residing in a foreign neutral country acquired the commercial privileges attached to his domicil, and was, consequently, exempt from the operation of the law of his own country suspending the intercourse with the French dominions. (2 *Cranch,* 65. Murray v. The Charming Betsey.) The national legislature have adopted the same principle in the act of the 3d of March, 1800, applying the rule of reciprocity in cases of salvage to "the vessels or goods of persons permanently resident within the territory, and under the protection, of any foreign government," &c.; and, finally, before the case of the Venus, the supreme court applied the same principle to the law of insurance, and held a warranty of neutrality to be satisfied by the residence of the party as a merchant in a neutral country. (Livingston and Gilchrist v. The Maryland Insurance Company. February Term, 1813.) This was an action on a policy of insurance, containing a warranty that the property was neutral. That warranty was determined to be satisfied by the emigration of the party, a Spanish subject, to the United States, and residing there before the breaking out of the war in 1804, between Great Britain and Spain, the property having been captured by a British cruiser, and condemned in the prize court at Halifax as Spanish property. A majority of the court were of opinion, that the insured was to be considered as a merchant of the United States, whether he carried on trade generally, or confined himself to a trade from the United States to the Spanish provinces. See, also, 1 *Johns. Cas.* 363.

1816.

The Mary
and Susan.

Stress has been laid, in the argument before this court, on the fact that Charles Johnson, the commander of the Tickler, is an alien enemy; but on this point we are unanimous that it makes no differ-

Arnold v. The United Insurance Company; 1 *Caines' Rep.* 60. Jenks v. Hallett ; 2 *Johns. Cas.* 481. Johnston v. Ludlow; 1 *Caines' Cas. in Error*, 29., 2 *Johns. Cas.* 476. Duguet v. Rhinelander *et al.* It is much to be lamented, that we have not printed reports of the decisions in the British supreme court of prize, as many interesting points have been decided before the Lords of Appeal, of which we have no other account than occasional loose references to them. Among these is the case of Mr. Dutilth, mentioned by Dr. Robinson in the Indian Chief, 3 *Adm. Rep.* 21., which is more particularly stated by Sir John Nicholl, in a manuscript report, in the possession of the editor, of the hearing of the case of the Harmony, Bool, before the Lords, 7th of July, 1803. " The case of Dutilth, also, illustrates the present. He came over to Europe, as it is stated, in 1793, about the end of July, a time when there was a great deal of alarm on account of the state of commerce in Europe. He went to Holland, then not only in a state of amity, but also of alliance with this country; he continued there until the French entered. During

the whole time he was there, he was without any establishment. He had no counting house; he had no contracts nor dealings with contractors there. He employed merchants there to sell his property, paying them a commission. Upon the French entering into Holland he applied for advice, to know what was left for him to do under the circumstances, having remained there on account of the doubtful state of mercantile credit, which not only affected Dutch and American, but English houses, who were all looking after the state of credit in that country. In 1794, when the French came there, Mr. Dutilth applied to Mr. Adams, who advised him to stay until he could get a passport. He continued there until the latter end of that year, and having wound up his concerns he came away. Some part of his property was captured before he came there. That part which was taken before he came there was restored to him, (The Fair American, Adm. 1796,) but that part which was taken while he was there was condemned, and that because he was in Holland at the time of the capture." (The Hannibal and Pomona, Lords, 1800.)

ence in the case. Admitting that this circumstance 1816.
should bear at all upon the decision of the court, the
utmost that could result from it would be the con- The Mary and Susan.
demnation of his interest to the government as a
droit of admiralty. The owners and crew of the
Tickler are as much parti.s in this court as the com-
mander, and his national character can in nowise
affect their rights. But this court can see no reason
why an alien enemy should not be commissioned as
commander of a privateer. There is no positive law
prohibiting it; and it has been the universal practice
of nations to employ foreigners, and even deserters,
to fight their battles. Such an individual knows his
fate should he fall into the hands of the enemy; and
the right to punish in such case is acquiesced in by
all nations. But, unrestrained by positive law, we
can see no reason why this government should be
incapacitated to delegate the exercise of the rights
of war to any individual who may command its con-
fidence, whatever may be his national character.

The only grounds, then, on which the right of
restitution can be contended for in this case, arise out
of the President's instructions of the 28th of August,
1812. On these, three points are made : 1st. That
Johnson had, in fact, or ought from circumstances
to be presumed to have had, notice of those instruc-
tions. 2d. If he had not at the time of the capture,
yet, having received them before the arrival of the
prize in port, he was bound then to have discharged
her. 3d. That notice of the instructions was, in fact,
unnecessary, as the instructions of the President had,

as to the conduct of privateers, all the operation of laws.

On the second and third of these points there exists but one opinion in this court. Although some doubt may be entertained relative to the form or nature of the notice necessary, yet we all agree that some notice is necessary, and that notice must precede the capture. Instruction, *ex vi termini*, is individual. Instruction to A., independent of legal privity or identification, is not instruction to B. Not so with laws: their power floats on the atmosphere we breathe. Necessity, or convention, or power, has given them a legal ubiquity co-extensive with the legislative power of the government that enacts them. Notice here is altogether unnecessary, unless made so by the law itself. It is the *sic volo, sic jubeo*, of sovereign power, of which every individual subject to its jurisdiction is presumed to have notice, though time and distance stamp absurdity on the supposition. Unquestionably, the same operation might by law have been given to instructions emanating from the President; but this has not been done: on the contrary, the clause itself which vests the power in the executive, holds out the idea of the necessity of notice. That this notice must necessarily precede or accompany capture we are induced to infer from this consideration. By capture the individual acquires an inchoate statutory right, an interest which can only be defeated by the supreme legislative power of the Union. Condemnation does nothing more than ascertain that each individual case is within the Prize Act, and thus throws the individual upon his right acquired by

belligerant capture. Should the Prize Act, in the interim, be repealed, or its operation be suspended by the provisions of a treaty, there no longer exists a law to empower the courts to adjudge the prize to the individual captor. We can see nothing in the objects of the law authorizing the President to issue his instructions, nor in the instructions themselves, which can support the idea, that that which was lawfully prize of war at the time of capture should cease to be so upon subsequent notice of the instructions. Both the act itself, and the instructions, in their plain and obvious sense, may well be construed so as to arrest the arm of hostility before it has given the blow. But not only is there nothing either in the act or instructions to which an ulterior operation can be given, but the policy of the country, as well as the fair claims of the prowess, perseverance, and expenses of the individual forbid our giving an effect either to the act or the instructions which will deprive the captor of the just fruits of his bravery and enterprise. The fact of notice, then, alone remains to be considered: and this must either be inferred from circumstances, or received upon the evidence of confession. On this point, computation of time becomes material. The capture was made, as we collect from the officers and crew, on the 3d of September; but as the nautical calculation of time commences at noon, this may mean on the morning of the 4th of September. The additional instructions bear date the 28th of August, and were, probably, forwarded by the mail of the 29th. It cannot, therefore, be supposed that they were published in Philadelphia before the 31st

of August, nor in New-York before the 2d; at any rate, not before the 1st of September. This certainly leaves time enough for the information to have been communicated from New-York, but renders it impossible, that it could have been received either from the Eagle or the pilot boat, as they were both spoken off Charleston, and the latter was seven days out; whereas the Tickler left St. Mary's, in Georgia, on the 24th. Whether such information was not in fact communicated off New-York, is a point on which the evidence would leave us little room for a contrariety of opinion, were it not for the loss of the log-book and journal. For this circumstance, taken in conjunction with the evidence of confession, some of the court are inclined to entertain an unfavourable idea of the captor's cause. But the majority are of opinion, that they cannot attach so much importance to it. The evidence of Paine, Ferris, and Warren, all officers of the privateer, and, at the time of testifying, devested of all interest in the capture, positively negatives the only fact from which notice could be implied, to wit, the speaking of any vessel beside the Eagle and the pilot boat, previous to the capture of the Mary and Susan. And this, we think, is supported by probability, when it is considered how very few vessels at that time could venture to leave our ports; that there is no probability the Tickler could have ventured to lie off and on the port of New-York any length of time; and that, from her leaving the port of St. Mary's to her arrival at New-York, there elapsed no more than the ordinary time of performing that voyage. In addition to which considera-

tions, we cannot but think, that a copy of the journal
of this voyage was, as it ought to have been, depo-
sited in the custom-house; and this circumstance,
whilst it was calculated to make the captor less care-
ful in preserving the original enabled the claimant
to avail himself of every advantage which could have
been derived from the original.    On the evidence of
confession, we are not inclined to enter into the con-
sideration of the depositions, intended on the one
hand to support, and on the other to impugn, the
credibility of Waldron and Garnsey.    Nothing can
be more painful than the necessity of entering upon
such investigations; nothing more unsatisfactory than
to found a legal decision as to the credibility of a
witness upon oral testimony, unsupported by the
*evidentia rei.*    In this case we are induced to conclude
that these witnesses misunderstood Johnson; that
the knowledge of which the latter spoke, was that
acquired subsequent to the capture; that it could
not have related to any other knowledge we think
incontestible, from the single consideration that the
evidence in the case proves it to have been incon-
sistent with the fact.    It was not possible, under the
circumstances of the case, that such knowledge could
have been communicated for want of the means of
communication, and that it was not, is positively
sworn to by three witnesses whose testimony stands
wholly unimpeached.

Sentence of the circuit court affirmed with costs.